# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re                                        **Civil Case No. 13-879 (SRN)**

    Michael K. Doody,
        Debtor.

David F. Larson, individually, and                    **MEMORANDUM**
derivatively on behalf of DML Inc., a                 **OPINION & ORDER**
Minnesota corporation, and derivatively
on behalf of Greeley Associates LLC, a
Minnesota limited liability company,

        Plaintiffs-Appellants,

    v.

Michael K. Doody,

        Defendant-Appellee.

---

Michael D. O'Neill, Marten & Squires, P.A., 332 Minnesota Street, W2750, St. Paul, Minnesota 55105, and Kurt M. Anderson, Attorney at Law, PO Box 2434, Minneapolis, Minnesota 55402, for Plaintiffs/Appellants

Timothy Pramas, Manty & Associates, P.A., 510 First Avenue North, Suite 305, Minneapolis, Minnesota 55403, and Karl J. Johnson, Law Office of Karl Johnson, 3710 Tenth Avenue South, Minneapolis, Minnesota 55407, for Defendant/Appellee

---

SUSAN RICHARD NELSON, United States District Judge

      Appellants/Plaintiffs appeal from a February 27, 2013 Order for Judgment and Judgment of the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court") in the matter of In re Michael K. Doody, 11-BR-36098.  (Order for Judgment [Doc. No. 4-16]; Judgment [Doc. No. 4-17].)   For the reasons set forth herein, Appellants' appeal is denied and the Bankruptcy Court's February 27, 2013 Order for Judgment and February 27, 2013 Judgment are affirmed.

# I. BACKGROUND

## A. Procedural Background

In January 2010, Appellants/Plaintiffs filed an action in Minnesota state court against Appellee Michael Doody and two corporate defendants, asserting breach of fiduciary duty claims arising under common law and Minnesota statutes. (State Court Compl., Ex. A to Compl. [Doc. No. 4-2], Appellants' App. 1.) Just prior to the trial in that action, Appellee Michael K. Doody filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court"). (Compl. ¶ 24 [Doc. No. 4-2].) Consequently, the trial in state court did not proceed. Appellants/Plaintiffs filed the underlying adversary proceeding in Bankruptcy Court on February 7, 2012, seeking an exception to the discharge in bankruptcy of Bankruptcy Debtor/Appellee Doody's alleged liabilities to Appellants/Plaintiffs pursuant to 11 U.S.C. § 727(a)(5). (Id. ¶¶ 43-44.) Specifically, Appellants/Plaintiffs alleged entitlement to non-discharge based on actual fraud, breach of fiduciary duty, embezzlement, and willful and malicious damage to property under 11 U.S.C. §§ 523(a)(2)(A); 523(a)(4); 523(a)(6). (Id. ¶¶ 26-44.)

The adversary proceeding was tried before United States Bankruptcy Judge Kathleen Sanberg on February 26, 2013. The Bankruptcy Court admitted numerous exhibits and heard testimony from Appellant/Plaintiff David Larson and Appellants'/Plaintiffs' financial consultant, Debbie Larson. At the conclusion of Appellants'/Plaintiffs' case, Doody moved for judgment on partial findings pursuant to

Fed. R. Bankr. P. 7052(c) and Fed. R. Civ. P. 52(c).  Judge Sanberg granted Doody's

motion, providing her findings and conclusions on the record.  (Tr. at 267-71 [Doc. No.

6].)  On February 27, 2013, the Bankruptcy Court entered an Order for Judgment and

Judgment in Doody's favor, finding that Doody's debt to Appellants/Plaintiffs, if any,

was not excepted from the discharge of Doody's Chapter 7 bankruptcy debt pursuant to

§523(a).  (Order for Judgment at 1-2 [Doc. No. 4-16]; Judgment [Doc. No. 4-17].)

Appellants/Plaintiffs filed a timely notice of appeal under 28 U.S.C. § 158(a).  The

Bankruptcy Court maintained jurisdiction over Doody's Chapter 7 case and the adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the Bankruptcy Court's Order for

Judgment is a final, appealable order.

### B.    Factual Background

Appellant David Larson testified that he met Appellee Michael Doody ("Doody")

while Larson was getting a haircut at a salon operated by Doody's wife, Carrie Doody.

(Tr. at 11 [Doc. No. 6].)  Michael Doody encouraged Larson to invest with him in a

remodeling business venture.  (Id.)  Larson, who was then working as a natural gas fitter

and service technician at Xcel Energy, had performed home remodeling work in the past.

(Id. 8-9.)  Larson invested in the proposed remodeling project on a single house, making

approximately $1,500 in profit.  (Id. at 13.)  Doody suggested that they continue working

together and referred Larson to an attorney to assist in the process of incorporation.  (Id.

at 14.)

Larson incorporated Appellant DML, Inc. ("DML") as a Minnesota Domestic

Business corporation with the Minnesota Secretary of State under Minn. Stat. § 302A in

3

April 2004.  (<u>Id.</u> at 15.)   Three thousand shares of stock were issued for DML, with Larson the sole shareholder at all times.  (<u>Id.</u> at 150.)  Although DML was originally incorporated as a real estate investment company, Larson testified that it was ultimately a home remodeling company. (<u>Id.</u> at 27.)   Larson was DML's CEO and President.  (<u>Id.</u> at 114.)

In the summer of 2004, Larson and Doody attended a "Real Estate 101" conference together in Detroit.  (<u>Id.</u> at 16.)  Larson later completed a similar class offered by Doody.  (<u>Id.</u>)   Shortly after Larson completed Doody's course, Doody suggested that they go into the home remodeling business together.  (<u>Id.</u> at 21.)  Larson testified that he made it clear that he wanted a 50/50 partnership and that he did not want to be limited to construction work.  (<u>Id.</u> at 22.)

In terms of their business arrangement, Larson testified to his understanding that he was to oversee day-to-day operations, including performing the role of project manager on construction jobs, while Doody was to perform office work such as bookkeeping, payroll, and accounts receivable.  (<u>Id.</u> at 23-25.)  Doody sketched out this contemplated business structure on paper shortly after Larson had incorporated DML.  (<u>Id.</u> at 26; Pls.' Ex. 2, Pls.' App. at 124-25.)  The sketch, which Larson himself described as "chicken scratch," listed "Finance" as an area under Doody's oversight.  (Tr. at 24; 26 [Doc. No. 6].)   Larson testified that after the sketch was made, he and Doody agreed to go into business 50/50.  (<u>Id.</u>)  The record contains no evidence showing that Larson changed the status of DML with the Minnesota Secretary of State from a business corporation to a partnership, nor that any stock was issued to Doody, although Doody

later indicated that he possessed a 50% stock ownership interest in DML on a 2005 IRS K-1 form.  (Id. at 30; Pls.' Ex. 3, Pls.' App. at 126-28.)

Doody was responsible for preparing DML's 2005 tax return, with the assistance of an accountant.  (Tr. at 27 [Doc. No. 6].)  The address noted on DML's 2005 tax return was Michael Doody's personal address in Arden Hills, Minnesota.  (Id. at 29.)  While Larson considered Doody to be the "money guy" (id. at 34), Larson conceded some involvement in DML's finances, including determining DML's financial policies.  (Id. at 118.)  Beginning in 2005, Doody managed DML's finances using a program called Quickbooks.  (Id. at 34.)  Larson acknowledged that he had twenty-four-hour access to Quickbooks information via the Internet.  (Id. at 118.)  Larson also agreed that from 2005-2008, he had the power to guarantee or co-sign loans for DML and that he possessed the authority to countersign checks throughout DML's history.  (Id. at 120.)  In addition to Doody's bookkeeping work, because Doody possessed a master plumber's license, he often performed plumbing work when DML required such work on its remodeling projects.  (Id. at 82; 146.)

Early on, Larson reported that DML was busy and that he was "swamped."  (Id. at 41.)   DML's tax returns showed a steady increase in gross receipts and sales over a three-year period.  (Id. at 40.)   Because of the long hours he was working, Larson engaged in a daily conversation with Michael Doody about when Larson could expect to see a return on his investment in DML.  (Id. at 44.)  Doody encouraged Larson to keep working and that success would not "come easy."  (Id. at 45.)   Larson conceded that there are no guarantees in life.  (Id. at 132.)   On the bookkeeping side, Doody also found

it difficult to keep up with the volume of work and eventually approached Larson about obtaining bookkeeping assistance for DML.  (Id. at 35.)  Beginning in August 2006, Doody's sister, Vicki Born Doody ("Born Doody"), was hired as a bookkeeper.  (Id. at 37.)  While Larson felt obliged to hire Born Doody because of her relationship to Doody, Larson acknowledged that Born Doody possessed an appropriate bookkeeping background and he agreed to hire her.  (Id. at 128-29.)  The other candidate whom Larson had considered for the bookkeeping position was one of Larson's relatives.  (Id. at 35.)

Larson, Doody and Born Doody were issued US Bank/Bremer Bank credit cards for DML.  (Id. at 69.)  When Doody or Larson incurred a credit card expense for DML, or a cash expense, DML would reimburse them.  (Id. at 145.)

At some point during their DML working relationship, Doody approached Larson about investing in Appellant Greeley Associates, LLC ("Greeley"), one of Doody's business ventures, in a deal involving apartments.  (Id. at 77.)   Because Larson did not understand the technicalities of the transaction necessary for Larson to obtain funding, he granted Doody a limited power of attorney.  (Id. at 77-78.)  Larson invested in the Greeley transaction, for which he received a seven percent ownership interest.  (Id.)  Larson understood that it was an investment and agreed that "there's a risk in everything."  (Id. at 133.)  Larson also granted Doody a power of attorney for the purpose of helping Larson renegotiate the terms of repayment of Larson's personal credit card debt.  (Id. at 99.)

At some point in 2007, Larson became aware of delinquencies in DML's tax

obligations.  (Id. at 51.)  Larson testified that Doody informed him about the tax problems (id. at 52), however, Doody told an IRS agent the opposite: that it was Larson who told Doody.  (Pls.' Ex. 10, Pls.' App. at 137.)  Larson testified that the early communications from the IRS were sent to Doody's home address. (Tr. at 53; 63 [Doc. No. 6].)  By April 9, 2007, a notice addressed to DML was sent to DML's leased office space (id.), and by July 2, 2007, a notice addressed to DML was sent to Larson's personal address in Lino Lakes.  (Id. at 54.)  Larson testified that he thought Doody was dealing with the IRS, based on his understanding of the division of responsibilities.  (Id. at 55.)

Regardless of who first knew of DML's tax problems, there is no dispute that at some point during 2007, both Doody and Larson were aware that DML was delinquent in its taxes.  (Id. at 124-25.)  Larson testified that he, Doody, and Born Doody held numerous meetings in 2007 to discuss DML's tax delinquency.  (Id. at 123; 126.)  During 2007 and 2008, Larson, Doody, and Born Doody exchanged many emails, discussing DML's financial issues in detail.  (Id. at 39-40.)  Larson acknowledged that Born Doody's business practice was to let Larson and Doody know of DML's obligations with respect to taxes, expenses, and bills.  (Id. at 162.)  If Born Doody had a question about an expense, she would ask either Larson or Doody for more information and clarification.  (Id. at 158-59.)  DML attempted to collect funds from outstanding accounts receivable in order to pay DML's tax obligations.  (Id. at 124.)  Larson assisted in these collection efforts.  (Id. at 113.)  In addition, Larson testified that he had some involvement with accounts payable because creditors complained that Born Doody would not return their calls, and would consequently call Larson.  (Id. at 113.)  During the time that the

delinquent taxes were increasing, other obligations of DML, including payroll, were being paid.  (Id. at 127.)  Larson agreed that he played a role in authorizing such payments.  (Id.)  Larson himself continued to receive his own pay from DML every two weeks.  (Id. at 129-30.)

Even though at one point DML posted gross sales of over $ 1 million, it was ultimately unable to generate significant profit.  (Id. at 39-40.)  Larson testified that over the course of 2007, DML's money crunch steadily worsened.  (Id. at 156.)  Compounding DML's financial difficulties, the real estate market experienced a downturn in 2008.  (Id. at 109.)  Larson also conceded that DML had problems with its projects running over budget.  (Id. at 151.)  In 2008, DML ceased business operations.  (Id. at 98.)

Although Larson had believed that he and Doody were 50/50 partners in DML, he learned otherwise.  Larson testified that in 2010 he learned that Doody held no business interest in DML.  (Id. at 49.)   Larson's sister, Debbie Larson, who is an accountant, performed an audit of DML's finances on her brother's behalf.  (Id. at 75.)   Debbie Larson reviewed certain DML records and noticed the change in Doody's business interest to 0%.  (Id. at 49.)   As noted earlier, although DML's business corporation status – listing Larson as the sole DML shareholder – was never changed to a partnership or to reflect any changes in shareholders, on a 2005 IRS K-1 form, Doody indicated that he possessed a 50% stock ownership interest in DML.  (Id. at 30; Pls.' Ex. 3, Pls.' App. at 126-28.)   On a 2006 IRS K-1 form, Doody indicated that he possessed a 40% stock ownership interest in DML, with Larson maintaining a 60% ownership interest.  (Pls.' Ex. 5, Pls.' App. at 129-31.)   On the 2007 IRS K-1 form, David Larson was listed as

possessing 100% of the stock ownership of DML.  (Pls.' Ex. 6, Pls.' App. at 132-33.)

In December 2008, an IRS officer interviewed Michael Doody regarding DML's taxes.  (Pls.' Ex. 10, Pls.' App. 134-138.)  Doody indicated that his DML job title was "outside sales consultant."  (Tr. at 135 [Doc. No. 6].)  He noted that he had invested at least $10,000 in the business, that he removed his name from the company's bank signature cards in September 2008, that DML's financial statements were reviewed by David Larson, and that DML's business address was the same as Larson's home address. (Id. at 135.)  In addition, Doody informed the IRS officer that from 2007-2008, Doody directed or authorized payments of bills, opened or closed bank accounts for DML, and signed or counter-signed checks.  (Id. at 136.)  For all of these duties, Doody indicated that David Larson also performed these duties.  (Id.)  Doody disclaimed any role with respect to payroll tax returns and federal tax deposits, indicating that David Larson performed this duty, as well as an accountant, with respect to payroll tax returns.  (Id.)

Larson testified that certain of the information that Doody provided to the IRS officer was inaccurate.  (Id. at 58-64.)  For example, Larson testified that Doody was incorrect in reporting that Larson authorized payroll and that Larson authorized or made federal tax deposits.  (Id. at 60-61.)  However, Larson also testified that he had some involvement in determining DML's financial policies, had a small role in authorizing or directing the payment of bills to creditors, and that he had the power to countersign checks for DML, and to co-sign or guarantee loans for DML.  (Id. at 120.)  In addition, Larson testified that he was involved in payroll by giving time sheets to Doody or Born Doody and authorizing payments.  (Id. at 112-13.)  Larson further acknowledged that he

possessed the overall authority to authorize payroll, make federal tax deposits, sign tax forms on behalf of DML, and had the power to review, sign, or transmit payroll tax returns for DML.  (Id. at 121.)

Larson's sister, Debbie Larson, who reviewed DML's financial documents, performed an audit on Larson's behalf, and testified at trial.  (Id. at 75.)   Ms. Larson prepared a trial exhibit listing the total of DML's delinquent taxes, Plaintiff's Trial Exhibit 13, and which Appellant/Plaintiff Larson submitted as evidence that Doody diverted funds belonging to DML or Greeley for his own personal or other business interests.  (Appellants' Mem. at 15 [Doc. No. 11].)   Larson maintains that he never authorized Doody to make payments to himself that were not documented as DML-related, nor did he authorize credit card expenses that were unrelated to DML.  (Tr. at 75-76 [Doc. No. 6].)   In terms of how Ms. Larson categorized DML's expenses, she indicated that certain transfers that she categorized as "embezzlement" because she lacked sufficient documentation, may have been legitimate business transfers.  (Id. at 239-50.)  For example, Ms. Larson categorized $8,200 in payments from DML to Red Branch, another entity owned by Doody, as "embezzlement," however she also acknowledged that documentation supported a finding that the $8,200 was repayment of a legitimate loan from Red Branch to DML.  (Id. at 211-14.)

## C.    Bankruptcy Court's Ruling

In the underlying adversary proceeding, Larson alleged that DML's creditors, including the IRS, have asserted claims against Larson and DML.  (Compl. ¶ 14 [Doc. No. 4-2].)  Furthermore, Larson asserted that Doody refused or failed to contribute to

payments made on behalf of DML, causing Larson to pay a disproportionate share of DML's liabilities to creditors.  (Id.)  Larson maintained that his claims against Doody should be excepted from Doody's bankruptcy discharge based on allegations of fraud, breach of fiduciary duty, embezzlement, and willful and malicious damage to property. (Id.  ¶¶ 26-44.)

In granting Doody's Rule 52(c) motion for judgment on partial findings, Judge Sanberg made findings of fact and conclusions of law with respect to each claim.  (Tr. at 268-71 [Doc. No. 6].)  As to fraud, Judge Sanberg did not find evidence of specific statements which Doody knew to be false when made, with the intention of causing Larson to take some form of action.  (Id. at 268.)  Accordingly, the Bankruptcy Court found against Appellants'/Plaintiffs' claim that Doody made representations to Larson that met all of the elements of fraud under 11 U.S.C. § 523(a)(2)(A).

As to Doody's ownership interest in DML, the Bankruptcy Court found no evidence establishing any such interest.  (Id.)  Rather, the Bankruptcy Court found, "There's been no evidence that Mr. Doody was an employee, not an officer, not a director."  (Id.)  The Bankruptcy Court found that Doody's statements in tax forms were not evidence that Doody was a DML shareholder.  (Id.)  Instead, the court found that the DML shares were issued to Larson alone when DML was incorporated: "There's no indication that Mr. Doody had any of the shares, any shares were transferred and I understand that there was a belief that there was a 50/50, that this was going to be a partnership, but I believe that was a hope rather than any legally binding agreement."  (Id. at 269.)

The Bankruptcy Court also found that Larson owed no legal obligation as a fiduciary.  In addition, the court considered whether Larson's evidence of the grant of a power of attorney established a breach of fiduciary duty.  (<u>Id.</u>)  The court found that Mr. Doody's power of attorney did not establish a breach of fiduciary duty, as there was no evidence to show that Doody took money that did not belong to him.  (<u>Id.</u>)   To the contrary, the court found, the testimony showed that Doody helped Larson.  (<u>Id.</u>)  Accordingly, the Bankruptcy Court determined that the claim that Doody possessed a fiduciary duty that he violated, and which is cognizable under 11 U.S.C. § 523(a)(4), failed.

Regarding Larson's claim of embezzlement, the court found no evidence that Doody was an employee and concluded that there was no embezzlement, stating, "at best there was negligence in terms of paying credit cards and not paying the IRS, but there was no legal obligation and Mr. Larson had complete availability to see the information, to go in Quickbooks.  There was no indication that things were being hidden from him."  (<u>Id.</u>)   Judge Sanberg thus found that the embezzlement claim failed.

As to Larson's claim that Doody's silence about the level of his ownership interest in DML amounted to fraud, the court found that Doody had no legal duty to inform Larson:

> There was nothing to inform him of.  The supposed decreasing of his interest – as I said, there was nothing to establish that he actually had an interest, legally recognizable interest, in the company.  At best it was a representation or belief that he was going to be a 50/50 partner, but nothing that I see – nothing that was proven to be – rise to the level of a fiduciary duty.

(Id. at 270.)

The Bankruptcy Court also found that evidence relating to the failure of the business and that certain items were being paid or not paid, whether on credit cards or otherwise, was insufficient to establish fraud.  (Id.) The court concluded that while Doody took advantage of Larson, Larson did not establish the type of injury under 11 U.S.C. § 523 that would except the liabilities from bankruptcy discharge. (Id.)  Finally, although not an issue on appeal, the Bankruptcy Court found no willful and malicious injury.  (Id. at 268.)

On appeal, Appellants argue that they presented enough evidence at trial to present a prima facie case that Doody owed them a fiduciary duty and was capable of embezzlement.  (Appellants' Mem. at 1 [Doc. No. 11].)  In addition, Appellants contend that Appellants presented enough evidence at trial to present a prima facie case that Appellee committed fraud against them.  (Id.)   Accordingly, Appellants argue that the Bankruptcy Court erred in its ruling.  (Id. at 1-2.)

## II.    DISCUSSION

In an appeal from a bankruptcy court proceeding, this Court acts as an appellate court.  See 28 U.S.C. § 158(a). The Bankruptcy Court granted Doody's motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).  Rule 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law . . . .

Fed. R. Civ. P. 52(c).   On appeal, an appellate court reviewing a Rule 52(c) judgment made on partial findings "may not set aside the findings of fact unless they are clearly erroneous, i.e., a review of the evidence leaves the court with a firm belief that a mistake has been made."  Schoedinger v. United Healthcare of Midwest, Inc., 557 F.3d 872, 878 (8th Cir. 2009) (quoting 9 Moore's Federal Practice § 52.52[1] (2008)).  An appellate court reviews de novo the trial court's conclusions of law in rendering a Rule 52(c) judgment.  Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000).

In applying the clear error standard to the trial court's factual conclusions, as long as the trial court's "account of the evidence is plausible in light of the record viewed in its entirety," Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985), this Court will not reverse the trial court's "finding of fact simply because we 'would have decided the case differently.'"  Easley v. Cromartie, 532 U.S. 234, 242 (2001) (quoting Anderson, 470 U.S. at 573).  Instead, "a reviewing court must ask whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Moreover, where findings are made based on the credibility of witnesses, Rule 52(a)(6) provides that "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6).

In addition, "[i]n ruling on a Rule 52 motion the trial court need not consider the evidence in a light favorable to the plaintiff and may render judgment for the defendant if it believes the plaintiff's evidence is insufficient to make out a claim."  Geddes v. Nw.

Missouri State Univ., 49 F.3d 426, 429 n.7 (8th Cir. 1995) (citing Madison v. Frank, 966

F.2d 344, 345 (8th Cir.1992)).

### A.   Fraud

As noted, Appellants/Plaintiffs filed the underlying bankruptcy proceeding to

determine whether Chapter 7 Bankruptcy Debtor Doody was entitled to a discharge of

debts allegedly owed to Appellants/Plaintiffs, pursuant to 11 U.S.C. § 727(a)(5).  (Compl.

¶¶ 5; 43-44 [Doc. No. 4-2].)   Section 727(a)(5) states that the court shall grant a debtor a

discharge in bankruptcy unless "the debtor has failed to explain satisfactorily, before

determination of denial of discharge under this paragraph, any loss of assets or deficiency

of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  "[C]ourts are to construe

exceptions to discharge narrowly in deference to the fresh-start policy of the Bankruptcy

Code."  In re Scott, 403 B.R. 25, 34 (Bankr. D. Minn. 2009) (citing In re Miller, 276 F.3d

424, 429 (8th Cir. 2002); Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 853 (8th

Cir.1997), aff'd, 523 U.S. 57 (1998)).

Appellants/Plaintiffs invoked 11 U.S.C. § 523(a)(2)(A) in support of their claims

for exception to discharge based on fraud.  (Compl. ¶¶ 5; 26-35 [Doc. No. 4-2].)

"Section 523(a)(2)(A) of the Bankruptcy Code prevents persons from committing actual

fraud and then wiping away their resulting debt."  In re Miller, 276 F.3d 424, 429 (8th

Cir. 2002).  Section 523(a)(2)(A) provides, in pertinent part:

> A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt . . . for money, property, services, or an
> extension, renewal, or refinancing of credit, to the extent obtained by . . .
> false pretenses, a false representation, or actual fraud . . . .

11 U.S.C. § 523(a)(2)(A). In order to establish that debt falls within the Bankruptcy Code's exception for false pretenses, false representation, or actual fraud, a creditor must prove by a preponderance of the evidence that: (1) the debtor made a representation, (2) at the time the debtor knew that the representation was false, (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor, (4) the creditor justifiably relied on such representation, and (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made. 11 U.S.C. § 523(a)(2)(A); In re Blair, 324 B.R. 725, 729 (8th Cir. 2005) (citing Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 790 (8th Cir. BAP 1999)).

The Bankruptcy Court did not find evidence of specific statements which Doody knew to be false when made, with the intention of causing Larson to take some form of action.[1] (Tr. at 268 [Doc. No. 6].) On appeal, Appellants/Plaintiffs identify five alleged

---

[1] Appellants/Plaintiffs contend that the Bankruptcy Court erred in finding that Plaintiffs failed "to present a prima facie case that [Doody] committed fraud against them." (Appellants' Mem. at 1 [Doc. No. 11].) Appellee/Defendant Doody objects to Appellants'/Plaintiffs' framing of the issue, arguing that the issue is not whether the Bankruptcy Court found that Appellants/Plaintiffs failed to present a prima facie case of fraud, but whether the court found that Appellants/Plaintiffs failed to prove by a preponderance of the evidence that Doody committed fraud. (Appellee's Opp'n Mem. at 3 [Doc. No. 14].) As Doody notes, Judge Sanberg did not use the phrase "prima facie case" in her ruling (id.), which suggests that her ruling was based on a determination of the preponderance of the evidence. In any event, this argument is not determinative of the appeal. A court's decision under Rule 52(c) may be based on a failure to present a prima facie case, Geddes, 49 F.3d at 429 n.7, and a court may also render judgment under 52(c) by weighing the evidence and determining where the preponderance lies. See Apanda v. Iowa Beef Processors, Inc., 105 F.3d 662 (8th Cir. 1997) (noting that on defendant's motion pursuant to Rule 52(c), the district court found that the plaintiff failed to carry its burden of proof by a preponderance of the evidence).

fraudulent statements:

> (1) In the Real Estate 101 course, Doody told Larson that he was looking for business partners and called the course a mentorship program;

> (2) Doody represented to Larson that Doody would be a 50% owner of DML;

> (3) Doody represented to Larson that Doody would be responsible for all financial aspects of DML;

> (4) Doody represented to an IRS officer in December 2008 that

>> (a) he did not have an ownership interest in DML from 2006-06;
>> (b) he was only an "Outside Sales Consultant" from 2006-08;
>> (c) he did not "determine the financial policy for the business;"
>> (d) he did not "authorize payroll;"
>> (e) he did not "authorize or make Federal Tax Deposits;"
>> (f) he did not "prepare, review, sign, transmit payroll tax returns;"
>> (g) he did not "hire/fire" employees; and
>> (h) he learned of DML's tax delinquency through a call from Larson

> (5) Doody remained silent regarding the change in ownership interest in DML.

(Appellant's Mem. at 24 [Doc. No. 11].)

As to the first three statements identified by Appellants/Plaintiffs, all appear to have been true, or true to the parties' intentions, when made.   Regarding the Real Estate 101 course, there is no evidence that the alleged statement that Doody was looking for business partners was false at the time it was made.   In fact, Larson testified that prior to DML's existence, he and Doody did work together on a single house remodeling project. (Tr. at 13 [Doc. No. 6].)   For a representation to rise to the level of fraud for purposes of § 523(a)(2)(A), it must be false when made.   In re Blair, 324 B.R. at 729.   Moreover, there is no evidence that the statement was made to deliberately and intentionally deceive

Larson, which is another factor required for fraud.  Id.   The Bankruptcy Court's ruling with respect to this statement was proper.

Doody's representation to Larson that Doody would be a 50% owner of DML was also true to the parties' intentions at the time.  In any event, there is no evidence that Doody made the statement to deliberately and intentionally deceive Larson.  Judge Sanberg found: "[t]here's no indication that there was a belief that there was a 50/50, that this was going to be a partnership, but I believe that there was a hope rather than any legally binding agreement."  (Tr. at 269 [Doc. No. 6].)   The Bankruptcy Court properly found that this statement did not rise to the level of fraud.

The third allegedly fraudulent statement – that Doody would handle all of DML's financial tasks – was made by Doody on a handwritten organizational chart shortly after DML's incorporation.  (Pls.' Ex. 2, Pls.' App. at 124-25.)   The evidence shows that this statement was true when made and that it was not made with the intent to deliberately deceive Larson.  Larson testified that Doody was responsible for DML's 2005 taxes (Tr. at 27 [Doc. No. 6]), and that Doody initially handled bookkeeping matters until he could no longer keep up with the volume.  (Id. at 35.)  Shortly thereafter, Doody's sister was hired to perform bookkeeping work.  (Id. at 37.)   Moreover, as Appellee/Defendant notes, responsibility for financial work at DML evolved over time.  (Appellee's Opp'n Mem. at 11 [Doc. No. 14].)  Larson himself had some involvement with payroll and with accounts payable.  (Id. at 112-13.)   The Bankruptcy Court properly found that this statement did not constitute fraud.

The fourth allegedly fraudulent statement consists of certain representations made

by Michael Doody to an IRS officer in December 2008.  (Pls.' Ex. 10, Pls.' App. 134-

138.)  The statement that Doody lacked an ownership interest in DML was true, as the

evidence shows that all of the shares in DML belonged to Larson.   Importantly, because

none of these statements were made to Larson, there is no evidence that they were made

to deliberately and intentionally deceive a creditor.  Similarly, there is no evidence that

Larson relied on any of these statements.   In addition, as Appellee/Defendant notes,

because the statement to the IRS was made in December 2008, it cannot be the proximate

cause of damages occurring from 2006-08.

The fifth statement is Doody's alleged fraudulent omission in failing to tell Larson

that he "chang[ed] his ownership interest in DML Inc. without authority or approval from

Appellant Larson."  (Appellants' Mem. at 24 [Doc. No. 11].)  It is true that Doody's K-1

tax forms report a changing ownership interest.  (2005 K-1 Form, Pls.' Ex. 3, Pls.' App.

at 126-28; 2006 K-1 Form, Pls.' Ex. 5, Pls.' App. at 129-31; 2007 K-1 Form, Pls.' Ex. 6,

Pls.' App. at 132-33.)  However, the Bankruptcy Court determined that these K-1 tax

forms did not determine the actual ownership interest of DML, stating, "the statements in

the tax forms aren't evidence that [Doody] was or was not a shareholder."  (Tr. at 268

[Doc. No. 6].)  Rather, DML retained its status as a Minnesota business corporation – not

a partnership – and all shares of DML stock were issued solely to David Larson.  (Id. at

150.)  Because David Larson remained the sole shareholder of DML at all times, Judge

Sanberg found that while there was a hope that the business would be a 50/50 partnership,

"that was a hope rather than any legally binding agreement."  (Id. at 269.)  In addition,

there is no evidence that the statements in the K-1 forms were made to Larson, or with the

deliberate intent to deceive Larson. Accordingly, the Court finds that the statements in question do not satisfy all of the elements of fraud pursuant to § 523(a)(2)(A). The Bankruptcy Court's ruling with respect to fraud is affirmed.

### B.    Fiduciary Duty

In the underlying bankruptcy proceeding, Appellants/Plaintiffs also asserted an exception to Doody's discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(4). Under § 523(a)(4), an individual debtor in a Chapter 7 case is not discharged in bankruptcy from any debt incurred by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Determination of the existence of a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) is an issue of federal law. Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir.1997), cert. denied, 522 U.S. 1112 (1998). "It has long been established that the Bankruptcy Act reference to "fiduciaries" applies only to trustees of express trusts." Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 878 (8th Cir. 1985) (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934)). "In the § 523(a)(4) context, the fiduciary relationship must preexist 'the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring from the act from which the debt arose.'" Id. at 877 (quoting In re Dloogoff, 600 F.2d 166, 168 (8th Cir.1979)).

The express trust requirement, however, does not preclude the recognition of trust-type obligations created pursuant to statute or common law. Id. Bankruptcy courts therefore may look to state law to determine whether a fiduciary capacity exists when an express trust is lacking. Id. In In re Long, however, even though the Eighth Circuit

observed that Minn. Stat. § 520.01 defines a corporate officer as a fiduciary with respect

to a corporation and its shareholders, id. at 878, n.3, the court declined to find a fiduciary

relationship for purposes of § 523(a)(4):

> . . . [E]ven if Long personally had been named as trustee, or if we chose to
> impose the corporation's fiduciary duties on him by virtue of his officer
> status, we hold that he was not a trustee in the "strict and narrow sense," as
> required to bar discharge under § 523(a)(4).  It is the substance of a
> transaction, rather than the labels assigned by the parties, which determines
> whether there is a fiduciary relationship for bankruptcy purposes.

Id. at 878-79 (citing Davis, 293 U.S. at 333-34.)  Thus, In re Long makes clear that in the

context of bankruptcy, absent an express trust, the substance of the transaction in question

determines whether a "strict and narrow" fiduciary relationship may be found or whether

the relationship is more contractual than fiduciary. Id.   In addition to the "strict and

narrow" construction of a fiduciary relationship, exceptions to bankruptcy discharge, in

general, are to be narrowly construed, as noted herein.  In re Scott, 403 B.R. 25, 34

(Bankr. D. Minn. 2009).

Appellants/Plaintiffs contend that the Bankruptcy Court erred in finding that there

was no prima facie showing of a fiduciary duty, and therefore also erred in not reaching

the issue of whether such a duty had been violated.  (Appellants' Mem. at 1 [Doc. No.

11].)  Appellants/Plaintiffs assert that "[t]here is no doubt that the relationship of a

corporate officer to a corporation is a true fiduciary relationship." (Id. at 21.)

Appellants/Plaintiffs argue that Minnesota courts recognize the existence of *de facto* as

well as *de jure* corporate officers.  (Id. at 20) (citing Farmers Coop. Ass'n of Bertha v.

Kotz, 23 N.W.2d 576, 579 (Minn. 1946)).  Because Appellants/Plaintiffs contend that

Doody was a *de facto*, if not a *de jure*, officer of DML, they argue that the Bankruptcy Court erred in finding otherwise, and in not determining whether Doody violated his duties.  (Id. at 22.)

Appellants/Plaintiffs identify the following facts in support of their argument that Doody was essentially a "corporate insider:" (1) Doody's high level of experience and sophistication with respect to running a small business, as compared to Larson's inexperience; (2) Doody's recommendation of legal counsel for DML's incorporation; recommendation of hiring his sister as bookkeeper; and recommendation and selection of a tax consultant; (3) Doody's use of Doody's home address as DML's corporate address "until problems evolved in consequences;" (4) Doody's handwritten outline of DML's corporate structure and consistent actual practices; (5) Doody's representation that DML would be a 50/50 partnership, along with Doody's representations in K-1 tax forms; (6) Doody's representation to an outside party that he was an officer/owner of DML; and (7) Doody's appointment of himself as DML spokesperson in relation to the IRS payroll tax investigation.  (Id. at 19.)

The Bankruptcy Court, in ruling against Appellants/Plaintiffs on the fiduciary duty claim, found no evidence establishing a fiduciary relationship.  (Tr. at 268 [Doc. No. 6].) Certainly, there is no evidence in the record showing the existence of an express trust. Appellants/Plaintiffs contend, however, that Doody violated his fiduciary duty as an officer of DML.  (Appellants' Mem. at 18-19 [Doc. No. 11].)  As noted, Minnesota law recognizes the existence of a general fiduciary duty as to officers of corporations.  Minn. Stat. § 520.01, subd. 3.  However, the Bankruptcy Court found insufficient evidence of

Doody's status as an employee, officer, or director.  (Tr. at 268 [Doc. No. 6].)   Without clear evidence that Doody was a corporate officer of DML, that element of proof was lacking in order to establish the fiduciary duty of a corporate officer.  Given the record before this Court, the Bankruptcy Court's finding was not clear error.   In addition, the Bankruptcy Court considered whether Doody's actions with respect to the granting of powers of attorney constituted a breach of fiduciary duty.   Judge Sanberg found no evidence that Doody took advantage of the powers of attorney granted by Larson to Doody, but instead assisted Larson with respect to the transactions over which he was given such authority.  (Id. at 269.)   This finding is also supported by the record.

Considering the additional "substance of the transactions" identified by Appellants/Plaintiffs on appeal, this Court finds that they fail to support the finding of a fiduciary relationship for purposes of an exception to bankruptcy discharge.  In re Long, 774 F.2d at 878-79.   To the extent that Appellants/Plaintiffs rely on authority for the general proposition that a corporate officer, whether de facto or de jure, owes a fiduciary duty to the corporation, the authority on which they rely is not in the context of § 523(a)(4) of the Bankruptcy Code.  Again, exceptions to bankruptcy discharge are narrowly construed in order to serve the Bankruptcy Code's goal of offering a fresh start to bankruptcy debtors.  In re Scott, 403 B.R. at 34.

Doody's level of business experience and sophistication as compared to Larson's relative inexperience does not establish a fiduciary duty.  Nor does his recommendation of legal counsel for DML's incorporation, recommendation of his sister as bookkeeper, and selection of a tax consultant.  While Larson testified that he was influenced by

23

Doody's recommendations, Larson agreed to them.  (Tr. at 14-15; 128-29; 116 [Doc. No. 6].)  Larson argues that Doody's use of his home address as DML's corporate address and his handwritten outline of DML's structure and its actual practice created a fiduciary relationship.  (Appellants' Mem. at 19 [Doc. No. 11].)  However, the Bankruptcy Court found otherwise.  Based on the record, Judge Sanberg's finding was not clear error.  While the IRS initially sent tax letters to DML at Doody's home address, at other times, DML's corporate address was a rented office space, and at other times, it was Larson's home address.  (Tr. at 29; 53; 54; 63 [Doc. No. 6]. )   While Larson testified about Doody's role in DML's finances, Larson acknowledged his own status as CEO and President of DML at all times (id. at 114-15), and his own participation in certain of DML's financial matters.  (Id. at 39-40; 113; 127; 158-59.)

Evidence regarding Doody's representations concerning a 50/50 partnership and his representations in tax forms and to outside parties about his status within DML was also before the Bankruptcy Court.   The Bankruptcy Court found that the evidence regarding the 50/50 partnership representations failed to establish a fiduciary relationship: "At best, it was a representation or belief that [Doody] was going to be a 50/50 partner, but nothing that I see – nothing that was proven to be – rise to the level of a fiduciary duty."  (Id. at 270.)  The Bankruptcy Court's findings and conclusions with respect to fiduciary duty are supported by the record and are therefore affirmed.

### C.    Embezzlement

As noted, Appellants/Plaintiffs argue that Doody's debt is nondischargeable under § 523(a)(4) due to embezzlement.  "'Embezzlement, for purposes of section 523(a)(4), is

the fraudulent appropriation of property of another by a person to whom such property

has been entrusted or into whose hands it has lawfully come.'" In re Nail, 680 F.3d 1036,

1042 (8th Cir. 2012) (quoting In re Phillips, 882 F.2d 302, 304 (8th Cir. 1989)).

Appellants/Plaintiffs argue that the Bankruptcy Court erred in failing to recognize

Doody's employee or officer status in the corporation and further erred in finding Doody

incapable of committing embezzlement.  (Appellants' Mem. at 21 [Doc. No. 11].)

        While the Bankruptcy Court found no evidence that Doody was an employee, the

court considered his actions in reaching its decision on the embezzlement claim.  (Tr. at

269 [Doc. No. 6].)   As to the claims that Doody paid credit cards and did not pay the

IRS, Judge Sanberg found "at best there was negligence," but that Doody had no legal

obligation.  (Id.)  Moreover, the Bankruptcy Court found that Larson had "complete

availability to see the information, to go in to Quickbooks.  There was no indication that

anything was hidden from him."  (Id.)   The Bankruptcy Court thus found no fraudulent

appropriation because there was no legal obligation to use the funds otherwise and the

transactions could be readily viewed in DML's records.

        The Bankruptcy Court's findings are supported by the evidence and do not

constitute clear error.  Larson acknowledged that he had 24-hour access to the

Quickbooks financial information and that he had personally entered some data on

Quickbooks.  (Id. at 35; 118; 144.)  He also testified that both he and Doody used their

credit cards for DML business purposes and were later reimbursed.  (Id. at 145.)  In

addition, Debbie Larson testified that certain transfers to Doody or to Doody's other

businesses may have been legitimate business expenses.  (Id. at 239-50.)  She had

categorized the transfers as "embezzlement" not because of affirmative proof of embezzlement, but because she did not have sufficient documentation to determine whether they were for legitimate business expenses.  (Id.; 211-14.)  Debbie Larson further acknowledged that it was reasonable to reimburse Doody for his plumber's license if DML benefitted from the license.  (Id. at 241.)  She had categorized this expense as "embezzlement" as a "point of contention" because "there was a misunderstanding as to what Mr. Doody's actual role [was]."  (Id.)  For all of these reasons, this Court finds the Bankruptcy Court's ruling as to the embezzlement claim was not clear error and is supported by the record.

In conclusion, the Court denies Appellants' Appeal and affirms the ruling of the Bankruptcy Court as reflected in that court's February 27, 2013 Order for Judgment and February 27, 2013 Judgment.

**THEREFORE, IT IS HEREBY ORDERED that:**

1.    Appellants' Appeal from Bankruptcy Court is **DENIED**; and

2.    The Bankruptcy Court's February 27, 2013 Order for Judgment and February 27, 2013 Judgment are **AFFIRMED**.

Dated: January 22, 2014

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge